When I was growing up, Ontario was sort of an idyllic place. It was a nice place. Well, hopefully it will still remain that way after you hear these three cases, Your Honor. Good morning, Your Honor. It's Bruce Diesenhaus on behalf of the appellant. Can I ask you a question? Yes. Did you have a grandfather that worked for the post office? Yes. Is that right? Yes. Because he knew my father. I don't know whether I ever met your grandfather. Where did he work? In various places. Where? Yeah. But not something that I paid, honestly, all that much attention to. We're going back... A long time. Back 90 years. Okay. Yeah, because I've never seen that name before. It's one of the names that I can tell you. Everyone who has my last name in this country is related to me. I'm not sure if that's good or bad. So far it hasn't gotten any... So far, so good. Your Honor, in this case, I'd like to start with the analysis of qualified immunity. I realize I may be working a little bit backwards, but it seems to me that looking through all of these briefs and the 30-some-odd page decision that Judge Phillips wrote and the cases that she cited, many of which were decided after 1996, Detective Schneider is faced with a Hobson's choice given the instruction given to him to conduct an investigation. If he looked to state law that existed at the time that he was given the instruction, he would have not found any state statute that would have given him guidance. If he would have looked under federal law, he would not have found a specific federal statute that would have given him any guidance. Obviously, he would have looked to the Fourth Amendment. In the Ninth Circuit, the one decision that the district court relied upon and the ACLU relied upon was the Takeda decision, which issued in 1991. But Takeda, like many of the other cases that have addressed this issue of video surveillance in the workplace, have indicated that there is no per se Fourth Amendment violation with the use of video surveillance. There are a whole host of factors that need to be analyzed in order to make the determination as to whether or not the search is or isn't permissible under the Fourth Amendment. But Takeda itself involved very unusual facts, and in fact it involved two separate searches. The first search the court had no problem with, even though it was surveillance of an office, it was before the focus of the investigation had centered on a particular individual. We're talking about a locker room. I understand that. A place where people get dressed, use the facilities. I mean, we're talking about a very private area within the police department. How more private does the locker room become, Your Honor? What is the difference between a school locker room, where athletes congregate to dress, and a police locker room where police officers gather to dress? In one case, the court has indicated there's a diminished expectation of privacy. In the other, this court has now, or Judge Phillips has indicated, there is an objective expectation of privacy. Minnesota v. Carter indicated that. We're talking about video surveillance in the men's locker room. I understand one female officer used it and locked the doors. I understand, Your Honor. But if, for example, the department had stationed Detective Schneider in the locker room, and he would have conducted a visual search himself, sitting there, standing there, what is the actual difference? It's still visual surveillance. The cameras were focused in one place. It's not covert visual surveillance if he's actually sitting there seeing with his own eyes. True. People have the choice to respond to his presence there and react differently, put a towel on if they're overly modest, whatever. I mean, this is, regardless of Takeda, I mean, if someone just asked, do you think these folks have an expectation of privacy here? I mean, it's hard for me to imagine anybody answering that question in the negative. That's a very, I mean, this just doesn't seem to be that close a question. Well, Your Honor, if it wasn't that close a question, perhaps then the Ninth Circuit's decision in U.S., Gonzalez doesn't make sense, because in that case they made it very clear that as late as May of 2003, they were still not sure what the parameters or the contours of video surveillance under the Fourth Amendment were. I understand that the, you know, and we are still not sure whether we're going to have a London-style system out on the public streets and so forth and so on. Those are all unresolved questions, and this societal will deal with them in the fullness of time. But I'm not sure that it was an unresolved question as to whether or not in a locker room context, in a covert operation, that one could say that these people did not have an expectation. I mean, there's a reason why the lone woman had such an elaborate process to make sure nobody came in when she was using the restroom. She had an expectation of privacy that was being violated by a sneaky-peek camera. Also, wasn't this all about a flashlight, a missing flashlight? That's what the initial report was. There had been other theft reports, yes. Could they have done it differently? Sure. I mean, less intrusive means. Well, I don't know how you conduct an investigation, work-related or otherwise. The court seemed to accept that one way to do this was to simply ask everyone, did you take the flashlight? Realistically, if you have police officers stealing the equipment of other police officers, people who were sworn to uphold the law. How do you know it was a police officer? What other reasonable assumption would you make? I don't know. But how do you know it was a police officer? I don't. The purpose of the camera was to find out who it was. Presumably, it was a police officer because those were the people who primarily used that lock, who almost exclusively used that lock. Was the locker room ever cleaned? Yes. Could it have been custodians? Sure. Trustees? No. No. No inmates had access to the locker room. But this is a city facility for city employees. My greatest concern, Your Honor, is I understand the courts have, over the course of the last 10 years, watched with horror as video surveillance has grown, and a lot of it in circumstances that are mind-boggling as to the propriety of using that type of equipment. In general? We have a case where a school district strip-searched a 13-year-old girl. I understand, Your Honor, and I understand that there's a sense that things have gone too far. But we now have to go back to 1996, and what Brad Schneider was thinking at the time, he followed instruction to do what he did. Now, who decided to put the, who actually decided to put the... He was instructed to do that by his superiors. So who instructed him? His sergeant. He was a lieutenant, wasn't he? No. Wasn't he? I thought he was. There was an allegation that a lieutenant provided the camera for the surveillance, and it's actually a dispute as to how the decision was made. That was not one of the facts that was stipulated to. Okay. The real problem for me, notwithstanding the court's present-day concerns about video surveillance, is how, in 1996, without a case that's on point, that talks about lockers. I don't think there has to be a case that's exactly on point. I don't think you have to have a case that says that covert surveillance by a camera in a locker room violates the Fourth Amendment. I think it logically flows. Well, if he had been extraordinarily diligent and gone to look at case law throughout the country, he'd have found the case of Thompson v. Johnson County Community College, a district court of opinion out of the Tenth Circuit in 1996, which found 30-day surveillance of an employee locker room not to violate the Fourth Amendment. Now, I realize what the Tenth Circuit does may not matter to the Ninth Circuit, and I've often heard those words in explicit terms, but it seems to me that to put a burden on a detective to be able to ascertain that 10 years later, a district court judge is going to analyze whether the probable cause standard under the Fourth Amendment applies or the reasonable cause standard under Ortega v. O'Connor applies, and go through both analyses just because it may appear to the court or to an appellate panel that that might not have been the way ultimately judges would decide. But when you look at the decisions from the Ninth Circuit, from the California state courts, even the Sacramento County Sheriff's case that is referenced in both briefs, it seems to me that there's a clear line. I think that Detective Schneider is operating at the fringes of what the law is. The court's even still indicated that the court's grappling with how far video surveillance in the Fourth Amendment will go. I think it's unfair to impose liability on him. But the cases you're referring to are public spaces, not private spaces, or quasi-public. I also understand, though, and I think the Ninth Circuit has recognized, that this is essentially a commercial location. The officers are only there as part of their job. That area is entitled to less protection than, for example, their residence. So it seems to me that if you're now trying to analyze, and this court has repeatedly indicated, you have to analyze each case on its very peculiar facts in its circumstances. It just seems to me to be, given the law that underpins qualified immunity, you're penalizing an officer for... I mean, the officers are charged with making Fourth Amendment decisions all the time. That's true. But more often, the types of decisions they're being forced to make are those that relate to the use of force or the decision whether or not to make an arrest or a detention. This is an entirely different area and far greater. Everyone knows, most police officers know, and they're trained, what to do with the Fourth Amendment as it relates to interrogations, as to detentions, as to the use of force. There's no doubt in their mind what's appropriate and what isn't. But here, when you're talking about even the appropriate legal standard to use to analyze the propriety of the search, it seems to me that you impose an intolerable burden on Detective Snyder and anyone similarly situated to guess what a district court judge or an appellate panel are going to do 10 or 11 years later. I suspect it would have been much easier to argue this case had the videotape been discovered in 1997 so that we could have had the benefit of at least a prompt resolution of this issue. But now, going back 10 years, it's difficult to analyze without taking into consideration, at least in the back of your mind, the abuses that have happened over the last 10 years. I can't imagine any time in my life before or after law school where I would have answered the question about reasonable expectation of privacy differently. Respectfully, Your Honor, I look at it differently. I think when you look at Ortega v. O'Connor, which Judge Phillips rejected out of hand as the appropriate analytical standard, this was not only a criminal investigation. This was a work misconduct investigation. It didn't necessarily have to turn into a criminal investigation. It could have. But wasn't there a... There was a police report. A police report. There was. It was handled like a criminal investigation. Well, yes and no. It was handled in sort of a quasi-criminal, quasi-administrative function because, as a criminal matter, the case wouldn't have gone anywhere because there was literally no suspect. There was nothing that they had who could have identified who took the flashlight. So it wound up being handled through internal affairs as part of a work-related misconduct. And, again, it goes back to the point that for Detective Schneider to have engaged in the analysis that Judge Phillips did, I think places way too significant a burden on him. Didn't we have cases back in the 90s and even before about surveillance in restrooms, public restrooms? The police would be up there, peepholes, and sometimes they'd have some kind of video camera. None that predate this case. There are a number of cases that came down after which decried the use of those types of cameras. Certainly none cited by the ACLU. Certainly none cited by Judge Phillips. They both relied almost exclusively on Takeda. And I'll reserve my time. Except that you went over. But you're going to be back. We haven't been surveilling the clock. May it please the Court, I'm Peter Eliasberg from the ACLU of Southern California for the Plaintiff Class of Police Officers. Two of the named plaintiffs here are here today, Sergeant Bernhardt and Officer Ansman. Judge Leighton, if I might, I actually wish I'd just written down what you said and repeated it back to you because I think it is so obvious that if an office in a building that is not dedicated to private activities such as changing your clothes and showering is a place where we have a reasonable expectation of privacy against video surveillance, then it is abundantly clear for purposes of not only the First Amendment but qualified immunity. Judge Ward, you're correct. We don't need a case on point. That's what Hope v. Pelzer stands for. That's what Cox v. Roskildee stands for. We don't need a case on point. Why is that? Well, because the more egregious the behavior, the less we expect that the government will do it and the less likely it is that it will ever get up to an appellate level. So, you know, if the government starts selling babies and they say, well, there's no case on point, of course there's no case on point because it never gets to the level of an appellate opinion. But why is an office obviously more private? Most of the offices I know, unless you're unlucky enough to be in a cubicle, you have windows on your office. You don't have windows on a locker room. Offices, people regularly leave their doors open. You don't leave the doors of a locker room open. People don't sex segregate their offices, but they sex segregate locker rooms and that's completely consistent with our equal protection jurisprudence because we're engaging in private activities. And Judge Layton, you hit the nail on the head. What did Ms. Jansen do when she used that locker room? It wasn't that females regularly used that locker room. There was an odd situation where she had special uniform needs. She needed a bigger locker than was provided in the women's locker room. She took elaborate precautions to assure that her privacy was protected. And the last thing I really would point out, other than a couple of misstatements that I'd like to point out about what's in the record, you know, even if the issue, when Mr. Deason has tried to say, well, people see you in the locker room, your neighbor sees you, but I would venture to say that if any of you judges were in a gym locker room and your neighbor turned around, pulled out a camera, and started snapping pictures of you, you would be deeply, deeply offended. You know that your neighbor might see you. I would need more information. Fair enough, Judge Layton. But it's the reasonable person standard, not the reasonable judge from Washington. No, of course, Your Honor. You know, of course, Your Honor. You know, as you said, if you think the person next to you is kind of creepy, you go to the health club and ask for a different locker. You put a towel on. But when it's a camera, and it's covert, you have absolutely no control. And, of course, the creation of the permanent record also means it's no longer just that someone, your neighbor, might see you. Who knows what happens to a videotape? So all of those things make this so much more deeply offensive from a perspective of the intrusion than what goes on, than the violation of the Fourth Amendment rights that this Court held in Takeda. Let me just clear up a couple of things. There's no, there's nothing in the record that supports the allegation that this, or Mr. Deasonhouse's assertion that this was a hybrid criminal internal investigation, and therefore there's a basis to say that the reasonableness standard applies. First of all, even if the reasonableness standard applied, and we put this in our briefs, this fails miserably. What was the security concern? The theft of a flashlight? The defendants have also said clearly, despite Mr. Deasonhouse saying there were a lot of thefts or the reports of other thefts, their statement of undisputed fact says this camera was put in solely in response to a theft report by Mr. Larson. That theft report is in the record at AER 68 and 69, and that theft report is of a single flashlight. The record is also clear that this was a purely criminal investigation. The undisputed evidence in the record and the declarations of Sergeant Anderson and Sergeant Harris are that internal investigations are not handled by the Detective Bureau. They're handled by Internal Affairs. This was assigned to Sergeant, I'm sorry, at that time Detective Snyder in the Detective Bureau. He was not in Internal Affairs. So this was not a hybrid investigation or an administrative investigation. It was a criminal investigation. And as of 1991, this Court had made clear in Takeda that when the purpose of video surveillance is for a criminal investigation, the probable cause and warrant standard applied. But again, even if this Court were somehow to think that reasonableness under O'Connor and Ortega applies, the reality is the need for this kind of highly intrusive search was minimal. We're talking about a flashlight, a petty theft. Second of all, the District Court found and it was undisputed on the evidence in the record there were many less intrusive means of conducting this kind of investigation. Indeed, Sergeant Carroll's declaration, which is in the record that we submitted, in the AERs that we submitted, said we'd done investigations using bait bags and ultraviolet powder on bait bag items so that you don't need to put in a video camera and we'd done those investigations successfully in the department. The defendants put in no evidence to contradict either Sergeant Anderson's statement about least intrusive means or Detective Carroll's declaration. So the reality is even under the reasonableness test this fails miserably as a thing to do under the Fourth Amendment. And Judge Wardlaw, you're right. For a detective or anybody in a police department to say we know about excessive force but we don't know about the warrant requirement, we don't know about the Fourth Amendment, that's extremely troubling. It may be that force issues come up more often but detectives are called upon to engage in criminal investigations. And one of the main tools you use in a criminal investigation is to decide whether you need to do a search and if you need to do a search then you need to know the Fourth Amendment and know it well. It's no defense to say that this is some obscure area of the law. It's not. Did they ever figure out who took the flashlight? No. They never did. Or at least there's no evidence in the record that they ever did and Detective Schneider said that they didn't find out. And in fact, it's sort of the idea that this was such an important investigation raising security concerns, they left a videotape in the camera to be found 10 years later. So if this was really an important investigation, there was also evidence in the record if you're doing a surveillance, you book the tapes, you log the tapes, you do things like that, you don't leave them in the VCR. And the last point, just to respond, Your Honor, to two other, very quickly to three other cases that were brought up. The Thompson case, the defendant said this is like lockers in a school bank. We're not saying that every time there's literally a locker, automatically there's a triggering, but a bank of lockers in a school hallway is very different than lockers in a locker room that's closed where there are showers and toilets. The reason the showers and toilets are relevant is not because we're saying the camera was on the shower or the toilet. That would have been worse, but this is bad enough. But the fact is when you have showers and toilets, of course people are regularly changing clothes. So this is not like a school bank of lockers. So the Thompson case is completely irrelevant. The Gonzalez case, this was a mail room in a public hospital, open to the public, doors left open, windows into the mail room. We don't leave doors open in a locker room. We don't have windows into it. We don't open the police station to the public. As the record shows, undisputed to get into the area where the locker room was, you had to be buzzed through and escorted by a police officer. And the last thing, under the Sacramento County case, it doesn't help the defendants at all and it wouldn't have helped Mr. Schneider if he'd read it. The court says in that case the jail setting is unique. The jurisprudence that the court cites in the Sacramento County case, the Supreme Court case, is about the special circumstances of a jail, inmates rioting, the amounts of inmate on inmate violence, the incredible need to protect against the introduction of contraband. Those are not at issues in a police department and certainly not in a locker room in a police department. So that case would not have helped Mr. Schneider at all. And we've briefed in great detail the issue of the school locker room and most important of all, the issue is not just whether there is an expectation of privacy in a locker room but is there an expectation against a certain kind of intrusion. Vernonia was not about secret videotaped surveillance of students in a locker room. I think even Justice Scalia would have been appalled by that. It was about the taking of urine in which the students remained clothed except they could turn their backs. It was simply an entirely different issue from that. Putting that silent unblinking lens up in the ceiling and not telling the department officers that you are at risk of having there being a permanent record created of your activity in the locker room. If the court has no further questions, I have nothing further to add. Okay, we'll give you a minute for rebuttal.
judges: Pregerson, Wardlaw, Leighton